724   70 SUPREME COURT REPORTER

discrimination unlawful under California law. Such picketing may be barred by a State. Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 69 S.Ct. 684.

Mr. Justice DOUGLAS took no part in the consideration or decision of this case.



339 U.S. 323
**UNITED STATES v. BRYAN.**
No. 99.

Argued Dec. 15, 1949.

Decided May 8, 1950.

Rehearing Denied June 5, 1950.

See 339 U.S. 991, 70 S.Ct. 1018.

Helen R. Bryan, executive secretary of the Joint Anti-Fascist Refugee Committee, was indicted for violation of 2 U.S.C.A. § 192, in that she failed to produce records called for in subpoenas of House Committee on Un-American Activities. Judgment of conviction of the District Court for the District of Columbia, 72 F.Supp. 58, was reversed by the Court of Appeals, District of Columbia Circuit, Per Curiam, 174 F.2d 525, and the United States brought certiorari. The Supreme Court, Mr. Chief Justice Vinson, held that the government was not required to prove that a quorum of the committee was present when default occurred, and that under the circumstances disclosed by the record, a defense of lack of a quorum was not open to the defendant.

Judgment of the Court of Appeals reversed.

Mr. Justice Black and Mr. Justice Frankfurter dissented.

**1. United States ⚖=23**

Under statute providing that a person who has been summoned to testify or produce papers before either house of Congress or a committee thereof and willfully makes default shall be deemed guilty of a misdemeanor, judicial proceedings are intended as an alternative method of vindicating authority of Congress to compel disclosure of facts which are needed in fulfillment of the legislative function. 2 U.S.C.A. §§ 192, 194.

**2. United States ⚖=23**

Under statute providing that a person who has been summoned to testify or produce papers before either house of Congress or a committee thereof and willfully makes "default" shall be deemed guilty of a misdemeanor, "default" is a failure to comply with the summons. 2 U.S.C.A. § 192.

See Words and Phrases, Permanent Edition, for other judicial constructions and definitions of "Default".

**3. United States ⚖=23**

The statute providing that a person who has been summoned to testify or produce papers before either house of Congress or a committee thereof and willfully makes default shall be deemed guilty of a misdemeanor does not contemplate some affirmative act which is made punishable only if performed before a competent tribunal, but contemplates an intentional failure to testify or produce papers, however the contumacy is manifested. 2 U.S.C.A. § 192.

**4. United States ⚖=23**

The statute providing that a person who has been summoned to testify or produce papers upon any matter under inquiry before any committee of either house of Congress and willfully makes default shall be deemed guilty of a misdemeanor is not confined to cases in which there has been a refusal to testify or produce papers before a committee, in the presence of a quorum. 2 U.S.C.A. § 192.

**5. United States ⚖=23**

The statute providing that a person who has been summoned to testify or produce papers before either house of Congress or any committee thereof and willfully makes default shall be deemed guilty of a misdemeanor is designed to punish obstruction of inquiries in which Houses of Congress or their committees are engaged. 2 U.S.C.A. § 192.

**6. United States ⚖=23**

Under statute providing that a person who has been summoned to testify or produce papers before either house of Congress or any committee thereof and willfully makes default shall be deemed guilty of a misdemeanor, if it is shown that an inquiry in which a house of Congress or a committee is engaged is, in fact, obstructed by intentional withholding of documents, it is unimportant whether subpoenaed person proclaims his refusal to respond before the full committee, sends a telegram to the chairman, or simply stays away from the hearing on return day. 2 U.S.C.A. § 192.

**7. United States ⚖=23**

Under statute providing that a person who has been summoned to testify or produce papers before either house of Congress or any committee thereof and willfully makes default shall be deemed guilty of a misdemeanor, a default does not mature until return date of subpoena, whatever the previous manifestations of intent to default may be. 2 U.S.C.A. § 192.

**8. United States ⚖=23**

Under statute providing that a person who has been summoned to testify or produce papers before either house of Congress or any committee thereof and willfully makes default shall be deemed guilty of a misdemeanor, evidence that executive secretary of association had been validly served with a lawful subpoena by House Committee on Un-American Activities directing her to produce records within her custody and control, and that on day set out in subpoena she intentionally failed to comply, made out a prima facie case of willful default, without proof that quorum of committee was present. 2 U.S.C.A. § 192.

**9. Contempt ⚖=24**

Ordinarily, one charged with contempt of court for failure to comply with a court order makes complete defense by proving that he is unable to comply.

**10. Witnesses ⚖=16**

A court will not imprison a witness for failure to produce documents which he does not have unless he is responsible for their unavailability, or is impeding justice by not explaining what happened to them.

**11. Witnesses ⚖=16**

Persons summoned as witnesses by competent authority have a public duty, the discharge of which is essential to orderly operation of legislative and judicial machinery.

**12. Witnesses ⚖=16**

Every exemption from testifying or producing records presupposes a very real and substantial individual interest to be protected.

**13. Witnesses ⚖=16**

A witness cannot excuse a default on grounds of inability to comply with subpoena, in absence of even a modicum of good faith.

**14. United States ⚖=23**

Under statute providing that a person who has been summoned to testify or produce papers before either house of Congress or any committee thereof and willfully make default shall be deemed guilty of a misdemeanor, where executive secretary of association was summoned by House Committee on Un-American Activities to appear with records but failed to produce the records and did not, until two years later, at trial, seek to excuse noncompliance on ground that quorum of committee was not present, the failure to afford the committee an opportunity to consider objection or remedy was in itself a contempt of its authority and obstruction of its processes, and was a failure to exercise good faith. 2 U.S.C.A. § 192.

**15. United States ⚖=23**

Under statute providing that a person who has been summoned to testify or produce papers before any committee of Congress and willfully makes default shall be deemed guilty of a misdemeanor, where executive secretary of association was summoned by House Committee on Un-American Activities to testify and produce records, absence of committee quorum was no defense to prosecution for nonproduction

726                    70 SUPREME COURT REPORTER

of records, where immateriality of such fact was shown by reliance of witness before committee upon other grounds, and where it appeared that she would not have complied with subpoenaes no matter how the committee was constituted. 2 U.S.C.A. § 192.

**16. United States ⇐23**

Under statute providing that if person who has been summoned to testify or produce papers before any committee of Congress and willfully makes default shall be deemed guilty of a misdemeanor, where executive secretary of association was subpoenaed by House Committee on Un-American Activities to testify and produce records, but she failed to produce the records and was indicted for violation of the statute, government was not required to prove that a quorum of committee was present when default occurred, and under circumstances disclosed, defense of lack of quorum was not available to the secretary. 2 U.S.C.A. § 192.

**17. Criminal law ⇐393(1)**

In prosecution of executive secretary of association for failure to produce records as directed by subpoena of House Committee on Un-American Activities, permitting the government to read to the jury testimony given by secretary before House Committee when called upon to produce the records did not violate the statute which provides that no testimony given by a witness before any committee of either house shall be used as evidence in any criminal proceeding against him. 2 U.S.C.A. § 192; 18 U.S.C.A. § 3486.

**18. Criminal law ⇐393(1)**

The statute which provides that no testimony given by a witness before any committee of either house shall be used as evidence in any criminal proceeding against him in any court must be given effect by the courts though the purpose of the statute to make it possible to compel witnesses to give self-incriminating testimony was effectively nullified by a decision of the Supreme Court. 18 U.S.C.A. § 3486.

**19. Statutes ⇐184, 217.1**

Where the statute which provides that no testimony given by a witness before any committee of either house shall be used as evidence in any criminal proceeding against him in any court was invoked by witness who had refused to produce records called for by subpoena of House Committee on Un-American Activities, history of the statute, its original purpose, and its present status were all relevant considerations in its interpretation. 2 U.S.C.A. § 192; 18 U.S.C.A. § 3486.

**20. Criminal law ⇐393(1)**

The statute which provides that no testimony given by a witness before any committee of either house shall be used as evidence in any criminal proceeding against him in any court would not be construed to prevent admission of testimony relative to the nonproduction of records called for by subpoena of House Committee on Un-American Activities, if such result was contrary to congressional intent and would lead to absurd conclusions. 2 U.S.C.A. § 192; 18 U.S.C.A. § 3486.

**21. Criminal law ⇐393(1)**

The purpose of Congress in enacting the statute which provides that no testimony given by a witness before any committee of either house shall be used as evidence in any criminal proceeding against him in any court was more effectually to enforce the attendance of witnesses and to compel them to discover testimony, and thus to overcome the difficulties theretofore encountered because of insufficient penalties for nondisclosure, and because of the constitutional privilege against self-incrimination. 18 U.S.C.A. § 3486; U.S.C.A. Const. Amend. 5.

**22. United States ⇐23**

The statute which provides that a person who has been summoned to testify or produce papers before either house of Congress or any committee thereof and willfully makes default shall be deemed guilty of a misdemeanor, was intended merely to supplement the power to punish for con-

tempt by providing additional punishment. 2 U.S.C.A. § 192.

### 23. Criminal law ⚖=393(1)

Under the statute which provides that no testimony given by a witness before any committee of either house shall be used as evidence in any criminal proceeding against him in any court, the immunity provided is intended to apply only to past criminal acts concerning which the witness is called to testify. 18 U.S.C.A. § 3486.

### 24. United States ⚖=23

Under the statute which provides that a person who has been summoned to testify or produce papers before either house of Congress or any committee thereof and willfully makes default shall be deemed guilty of a misdemeanor, offense matures only when the witness is called to appear to answer questions or produce documents and willfully fails to do so. 2 U.S.C.A. § 192.

### 25. Contempt ⚖=2

There is, in our jurisprudence, no doctrine of anticipatory contempt.

### 26. United States ⚖=23

The words "criminal proceeding" within the statute which provides that no testimony given by a witness before any committee of either house shall be used as evidence in any criminal proceeding against him in any court, do not include prosecution of a witness for willful default under the statute which provides that a person who has been summoned to testify or produce papers before either house of Congress or any committee thereof and willfully makes default shall be deemed guilty of a misdemeanor. 2 U.S.C.A. § 192; 18 U.S.C.A. § 3486.

See Words and Phrases, Permanent Edition, for other judicial constructions and definitions of "Criminal Proceeding".

---

324

Mr. Philip B. Perlman, Sol. Gen., Washington, D.C., for the United States.

Messrs. O. John Rogge, Washington, D. C., and Benedict Wolf, New York City, for respondent.

Mr. Chief Justice VINSON delivered the opinion of the Court.

Respondent is the executive secretary of an organization known as the Joint Anti-Fascist Refugee Committee (hereinafter referred to as the association) and as such has custody of its records. Prior to April 4, 1946, the Committee on Un-American Activities of the House of

325

Representatives, which was conducting an investigation into the activities of the association, had attempted without success to procure these records from respondent and from the chairman of the association's executive board, Dr. Edward K. Barsky. On March 29, 1946, the Committee issued subpoenas to each of the known members of the executive board summoning them to appear in the Committee's room on April 4, 1946, at 10 a.m., to testify and produce certain specified records of the association, and an identical subpoena directed to the association by name was served upon respondent Bryan in her official capacity.

Bryan and the members of the executive board appeared before the Committee at the date and time set out in the subpoenas and in response thereto. Each person so summoned failed to produce any of the records specified in the subpoenas. The members of the executive board made identical statements in which each declared that he or she did not have possession, custody or control of the records; that Miss Bryan, the executive secretary, did. Respondent admitted that the records were in her possession but refused to comply with the subpoena because "after consulting with counsel [she] came to the conclusion that the subpoena was not valid" because the Committee had no constitutional right to demand the books and records. Asked whether the executive board supported her action, she refused to answer because she did not think the question pertinent.

728    70 SUPREME COURT REPORTER

The Committee on Un-American Activities then submitted its report and resolution to the House. Setting out at length the Committee's attempts to procure the records of the association, the report concludes: "The willful and deliberate refusal of Helen R. Bryan and the members of the executive board of the Joint Anti-Fascist Refugee Committee as named herein to

326

produce the books, papers, and records called for in the subpoenas deprives your committee of evidence necessary in the conduct of its investigation of the Joint Anti-Fascist Refugee Committee, which evidence is pertinent to the said investigation and places the said persons in contempt of the House of Representatives of the United States."[1]

The resolution directing the Speaker to certify the Committee's report to the United States Attorney for the District of Columbia for legal action was approved by the full House after debate.[2]

Respondent was indicted for violation of R.S. § 102,[3] in that she had failed to produce the records called for in the subpoenas and had thereby wilfully made default. At the trial she contended, *inter alia*, that she was not guilty of wilful default because a quorum of the Committee on Un-American Activities had not been present when she appeared on the return day. However, the trial court withdrew that issue from the jury's consideration by instructing the jury "as a matter of law, that the Committee on Un-American Activities of the House of Representatives was a validly constituted committee of the Congress, and was at the time of the defendant's appearance."

327

Respondent was found guilty, 72 F.Supp. 58, but the Court of Appeals for the District of Columbia, one judge dissenting, reversed the judgment on the ground that the presence of a quorum of the Committee at the hearing on April 4, 1946, was a material question of fact in the alleged offense and should have been submitted to the jury. 84 U.S.App.D.C. 394, 174 F.2d 525. We granted a writ of certiorari, 338 U.S. 846, 70 S.Ct. 87, to consider this important question affecting the procedures of congressional committees.

[1] *First*. R.S. § 102 was enacted in 1857. Its purpose, as stated by its sponsors, was to avoid the procedural difficulties which had been experienced by the House of Representatives when persons cited for contempt of the House were brought before its bar to show cause why they should not be committed, and, more important, to permit the imprisonment of a contemnor beyond the expiration of the current session of Congress.[4] Transmission of the fact of the commission of a contempt to the prosecuting authority is made under the Seal of the House or Senate by the Speaker or President of the Senate.[5] The judicial proceedings are intended as an alternative method of vindicating the authority of Congress to compel the disclosure of facts which are needed in the fulfillment of the legislative function. In re Chapman, 1897, 166 U.S. 661, 671–672, 17 S.Ct. 677, 681, 41 L.Ed. 1154; Jurney v. MacCracken, 1935, 294 U.S. 125, 151, 55 S.Ct. 375, 379, 79 L.Ed. 802.

---

1. 92 Cong.Rec. 3762, 79th Cong., 2d Sess. (1946).

2. Id. at 3773.

3. 11 Stat. 155, as amended, R. S. § 102, 2 U.S.C. § 192, 2 U.S.C.A. § 192.
   "Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months."

4. See, *e. g.*, remarks of Representative Orr, Cong.Globe, 34th Cong., 3d Sess. 405 (1857).

5. R.S. § 104, 2 U.S.C. § 194, 2 U.S.C.A. § 194.

[2] "Default" is, of course, a failure to comply with the summons. In this case we may assume, without deciding, that the subpoena served on respondent required her to produce the records of the association before the Committee on Un-American Activities, sitting as a committee.[6] Upon that assumption, respondent takes the position that, absent a quorum, the Committee was without power to receive the records on the return day; that she cannot be guilty of a default in failing to produce papers before an "agency organizationally defective," which, for that reason, "cannot be obstructed." Respondent does not and cannot, in view of the jury's verdict, contest the finding that she deliberately and intentionally refused to produce the papers called for in the subpoena. Her contention is that a quorum of the Committee was required to meet to witness her refusal. Reliance is placed upon certain precedents of the House of Representatives, which hold that a committee report may be challenged in the House on the ground that a quorum of the committee was not present when the report was approved, and upon this Court's recent decision in Christoffel v. United States, 1949, 338 U.S. 84, 69 S.Ct. 1447.

[3, 4] The Christoffel case is inapposite. For that decision, which involved a prosecution for perjury before a congressional committee, rests in part upon the proposition that the applicable perjury statute requires that a "competent tribunal" be present when the false statement is made. There is no such requirement in R.S. § 102. It does not contemplate some affirmative act which is made punishable only if performed before a competent tribunal, but an intentional failure to testify or produce papers, however the contumacy is manifested. Respondent attempts to equate R.S. § 102 with the perjury statute considered in the Christoffel case by contending that it applies only to the refusal to testify or produce papers before a committee—*i. e.*, in the presence of a quorum of the committee. But the statute is not so limited. In the first place, it refers to the wilful failure by any person "to give testimony or to produce papers *upon any matter under inquiry* before * * * any committee of either House of Congress," not to the failure to testify before a congressional committee. And the fact that appearance before a committee is not an essential element of the offense is further emphasized by additional language in the statute, which, after defining wilful default in the terms set out above, continues, "or who, *having appeared*, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, * * *." (Emphasis supplied.)

[5, 6] It is clear that R.S. § 102 is designed to punish the obstruction of inquiries in which the Houses of Congress or their committees are engaged. If it is shown that such an inquiry is, in fact, obstructed by the intentional withholding of documents, it is unimportant whether the

---

6. The subpoena read as follows:
   "By Authority of the House of Representatives of the Congress of the United States of America,
   "To the Sergeant-at-Arms, or His Special Messenger:
   "You are hereby commanded to summon the Joint Anti-Fascist Refugee Committee, 192 Lexington Avenue, New York City, a voluntary organization, to be and appear before the Un-American Activities Committee, of the House of Representatives of the United States, of which the Honorable John S. Wood is chairman, and to bring with you all books, ledgers, records, and papers relating to the receipt and disbursement of money by or on account of the Joint Anti-Fascist Refugee Committee or any subsidiary or subcommittee thereof, together with all correspondence and memoranda of communications by any means whatsoever with persons in foreign countries. The said books, papers, and records demanded herein are for the period from January 1, 1945 up to and including the date of this subpoena, in their chamber in the city of Washington, on April 4, 1946, at the hour of 10 a. m., then and there to testify touching matters of inquiry committed to said committee; and [she] is not to depart without leave of said committee.
   "Herein fail not, and make return of this summons. * * *"

730                  70 SUPREME COURT REPORTER

subpœnaed person proclaims his refusal to respond before the full committee, sends a telegram to the chairman, or simply stays away from the hearing on the return day. His statements or actions are merely evidence from which a jury might infer an intent to default. A proclaimed refusal to respond, as in this case, makes that intent plain. But it would hardly be less plain if the witness embarked on a voyage to Europe on the day before his scheduled appearance before the committee.

[7, 8] Of course a witness may always change his mind. A default does not mature until the return date of the subpœna, whatever the previous manifestations of intent to default. But when the Government introduced evidence in this case that respondent had been validly served with a lawful subpœna directing her to produce records within her custody and control, and that on the day set out in the subpœna she intentionally failed to comply, it made out a *prima facie* case of wilful default.

*Second.* It is argued, however, that even if the Government is not required to prove presence of a quorum affirmatively, lack of a quorum is a defense raising material questions of fact which should have been submitted to the jury. The theory is that if the subpœna required production of the records before the Committee on Un-American Activities *qua* committee, respondent could not have complied with the subpœna in the absence of a quorum had she wished to do so, and therefore her default is not wilful, albeit deliberate and intentional. While she did not introduce any direct evidence at the trial, respondent appropriately raised the defense by cross-examination and by her motions, requests and objections.

[9, 10] Ordinarily, one charged with contempt of court for failure to comply with a court order makes a complete defense by proving that he is unable to comply. A court will not imprison a witness for failure to produce documents which he does not have unless he is responsible for their unavailability, cf. Jurney v. MacCracken, supra, or is impeding justice by not explaining what happened to them, United States v. Goldstein, 2 Cir., 1939, 105 F.2d 150.

[11] On the other hand, persons summoned as witnesses by competent authority have certain minimum duties and obligations which are necessary concessions to the public interest in the orderly operation of legislative and judicial machinery. A subpœna has never been treated as an invitation to a game of hare and hounds, in which the witness must testify only if cornered at the end of the chase. If that were the case, then, indeed, the great power of testimonial compulsion, so necessary to the effective functioning of courts and legislatures, would be a nullity. We have often iterated the importance of this public duty, which every person within the jurisdiction of the Government is bound to perform when properly summoned. See e. g., Blair v. United States, 1919, 250 U.S. 273, 281, 39 S.Ct. 468, 471, 63 L.Ed. 979; Blackmer v. United States, 1932, 284 U.S. 421, 438, 52 S.Ct. 252, 255, 76 L.Ed. 375.

[12, 13] Certain exemptions from attending or, having attended, giving testimony are recognized by all courts. But every such exemption is grounded in a substantial individual interest which has been found, through centuries of experience, to outweigh the public interest in the search for truth. Dean Wigmore stated the proposition thus: "For more than three centuries it has now been recognized as a fundamental maxim that the public (in the words sanctioned by Lord Hardwicke) has a right to every man's evidence. When we come to examine the various claims of exemption, we start with the primary assumption that there is a general duty to give what testimony one is capable of giving, and that any exemptions which may exist are distinctly exceptional, being so many derogations from a positive general rule." [7]

---

7. Wigmore, Evidence (3d ed.) § 2192.

#### 332

Every exemption from testifying or producing records thus presupposes a very real interest to be protected. If a privilege based upon that interest is asserted its validity must be assessed. Since we assume in this case that the subpœnas refer to the production of papers before the Committee *qua* committee, we agree that respondent could rightfully have demanded attendance of a quorum of the Committee and declined to testify or to produce documents so long as a quorum was not present. But the courts need not treat as important that which the witness obviously regarded as unimportant.[8] Testimonial compulsion is an intensely practical matter. If, therefore, a witness seeks to excuse a default on grounds of inability to comply with the subpœna, we think the defense must fail in the absence of even a modicum of good faith in responding to the subpœna. That such was the situation in this case does not admit of doubt.

[14] In the first place, if respondent had legitimate reasons for failing to produce the records of the association, a decent respect for the House of Representatives, by whose authority the subpœnas issued, would have required that she state her reasons for noncompliance upon the return of the writ. At the time and place specified in

#### 333

the subpœnas the Chairman of the Committee and a number of other members—whether or not a quorum was present at any time is not clear from the record—presented themselves for the taking of testimony and receipt of papers. The defect in composition of the Committee, if any, was one which could easily have been remedied. But the Committee was not informed until the trial, two years after the refusal to produce the records, that respondent sought to excuse her noncompliance on the ground that a quorum of the Committee had not been present. For two years, now grown to four, the Committee's investigation was obstructed by an objection which, so far as we are informed, could have been rectified in a few minutes.

Such a patent evasion of the duty of one summoned to produce papers before a congressional committee cannot be condoned. Suppose one who has been summoned to produce papers fails to deliver them as required but refuses to give any reason. May he defend a prosecution for wilful default, many months later, on the ground that he had not been given a sufficient time to gather the papers? We think such a contention hardly tenable. Yet, at the return date, compliance with the subpœna was "impossible" just as in the present case. To deny the Committee the opportunity to consider the objection or remedy it is in itself a contempt of its authority and an obstruction of its processes. See Bevan v. Krieger, 1933, 289 U.S. 459, 464—465, 53 S.Ct. 661, 662–663, 77 L.Ed. 1316.

[15, 16] In the second place, the fact that the alleged defect upon which respondent now insists is, in her own estimation, an immaterial one, is clearly shown by her reliance before the Committee upon other grounds for failing to produce the records. She does not deny, and the transcript of the hearing makes it perfectly clear, that she would not have complied with the subpoenas no

#### 334

matter how the Committee had been constituted at the time. This Court considered a similar question in Hale v.

---

8. It is, of course, clear that respondent's "inability" to comply with the subpoena because a quorum of the Committee was not present amounts to no more than the claim that she is excused from doing so. The jury found that she had power to produce the papers. The question therefore arises as to what possible prejudice respondent might have suffered if she had turned over the records to less than a quorum of the Committee. In the case of oral testimony, a witness might well desire to appear only if a quorum was present because of a feeling that some committee members, unrestrained by presence of a majority, might exceed proper bounds of inquiry. But that consideration is obviously inapplicable to the production of papers and is irrelevant here in any event since respondent testified.

Henkel, 1906, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652, where a witness had refused in the trial court to produce certain books and papers called for by a subpoena *duces tecum* on three grounds, one of which was that it was impossible to collect the records within the time allowed. The Court pointed out that "Had the witness relied solely upon the first ground, doubtless the court would have given him the necessary time." 201 U.S. at page 70, 26 S.Ct. at page 377. But having refused compliance for other reasons which the lower court could not remedy, the witness could not later complain of its refusal to do a meaningless act —to grant him additional time to gather papers which he had indicated he would not produce in any event.[9] Here respondent would have the Committee go through the empty formality of summoning a quorum of its members to gather in solemn conclave to hear her refuse to honor its demands. Presumably the same formalism would be required if respondent had informed the Committee that she was not coming at all and did not do so.

In a not dissimilar case, Judge Learned Hand stated what we consider to be the basic question before us and gave the answer which we think must necessarily follow. He said:

"The question is no less than whether courts must put up with shifts and subterfuges in the place of truth and are powerless to put an end to trifling. They would prove themselves incapable of dealing with actualities if it were so, for there is no surer
335
sign of a feeble and fumbling law than timidity in penetrating the form to the substance." Loubriel v. United States, 2 Cir., 1926, 9 F.2d 807, 808.

We hold that the Government is not required to prove that a quorum of the Committee was present when the default occurred, and that under the circumstances disclosed by this record a defense of lack of a quorum was not open to respondent.

[17] *Third.* Respondent also contended at the trial that the court erred in permitting the Government to read to the jury the testimony she had given before the House Committee when called upon to produce the records. She relies upon R.S. § 859, now codified in § 3486 of Title 18 U.S.C., 18 U.S.C.A. § 3486, which provides that "No testimony given by a witness before * * * any committee of either House, * * * shall be used as evidence in any criminal proceeding against him in any court, except in a prosecution for perjury committed in giving such testimony. * * *" Admittedly her testimony relative to production of the books comes within the literal language of the statute; but the trial court thought that to apply the statute to respondent's testimony would subvert the congressional purpose in its passage.[10] We agree.

We need not set out the history of the statute in detail. It should be noted, however, that its function was to provide an immunity in subsequent criminal proceedings to witnesses before congressional committees, in return for which it was thought that witnesses could be compelled to give self-incriminating testimony.[11] That purpose was
336
effectively nullified in 1892 by this

---

9. See also, Blackmer v. United States, 1932, 284 U.S. 421, 443, 52 S.Ct. 252, 257, 76 L.Ed. 375; Leber v. United States, 9 Cir., 1909, 170 F. 881, 888; London Guarantee & Accident Co., Ltd., v. Doyle & Doak, C.C.1905, 134 F. 125; State ex rel. Berge v. Superior Court, 1929, 154 Wash. 144, 281 P. 335.

10. See the court's opinion in United States v. Barsky, D.C.1947, 72 F.Supp. 165, affirmed Barsky v. United States, 1948, 83 U.S.App.D.C. 127, 138, 167 F.2d 241, 252.

11. R.S. § 859, as originally enacted in 1857, was a part of § 2 of a comprehensive statute, 11 Stat. 155, designed on the one hand to compel the testimony of witnesses and on the other to protect them from prosecution for crimes revealed by their testimony. Section 1 of the Act became R.S. § 102, 2 U.S.C. § 192, 2 U.S.C.A. § 192. As first enacted, § 2 not only prevented the use of a witness' testimony in subsequent criminal proceedings but gave him complete immunity from

UNITED STATES v. BRYAN 733
Cite as 70 S.Ct. 724

Court's decision in Counselman v. Hitchcock, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110, holding that R.S. § 860,[12] a statute identical in all material respects with R.S. § 859, was not a sufficient substitute for the constitutional privilege of refusing to answer self-incriminating questions. Under that decision, a witness who is offered only the partial protection of a statute such as §§ 859 and 860—that his testimony may not be used against him in subsequent criminal proceedings—rather than complete immunity from prosecution for any act concerning which he testifies[13] may claim his privilege and remain silent with impunity.

[18] Section 860 was ultimately repealed. Its usefulness undermined by the Counselman decision, it remained on the statute books until 1910, "a shield to the criminal and an obstruction to justice."[14] But the attention of Congress 
337
has not, apparently, been called to the anomaly presented by the continued existence of R.S. § 859, which, like § 860, was a constituent part of an immunity "bargain" declared invalid in the Counselman case.[15] The courts must, therefore, give effect to the statute. Cameron v. United States, 1914, 231 U.S. 710, 720, 34 S.Ct. 244, 247, 58 L.Ed. 448.

[19, 20] Since respondent did not refuse to answer the questions put to her by members of the House Committee, her argument is not of denial of any constitutional right but solely that R.S. § 859 bars use of her testimony in her trial for wilful default.[16] The history of that statute, its

---

prosecution "for any fact or act touching which he shall be required to testify." 11 Stat. 156. This latter provision was deleted in 1862, 12 Stat. 333, leaving only the partial protection of § 859, which was in effect declared insufficient to require a witness to give self-incriminatory testimony in Counselman v. Hitchcock, 1892, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110.

12. R.S. § 860 applied to evidence obtained from a party or witness in any "judicial proceeding" and provided that such evidence should not be used against such person in any criminal proceeding.

13. See Brown v. Walker, 1896, 161 U.S. 591; 16 S.Ct. 644, 40 L.Ed. 819.

14. H.R.Rep.No.266, 61st Cong., 2d Sess., which was concurred in by the Senate Committee reporting the repealer, states:
"This section [860] was enacted apparently for the purpose of enabling the Government to compel the disclosure of incriminating testimony on condition that the witness disclosing the same would be given immunity. In the case of Counselman v. Hitchcock (142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110) it was held that legislation can not abridge a constitutional privilege, and that it can not replace or supply one, at least unless it is so broad as to have the same extent in scope and effect, and that said section 860 of the Revised Statutes does not supply a complete protection from all the perils against which the constitutional prohibition was designed to guard, and is not a full substitute for the prohibition, and that in view of the constitutional provision (article 5 of the amendments) a statutory enactment to be valid must afford absolute immunity against future prosecution for the offense to which the section relates.
"Since the decision above referred to section 860 has possessed no usefulness whatever, but has remained in the law as an impediment to the course of justice. Under it a witness can not be compelled to give any incriminating testimony whatever, but if he chooses to go on the witness stand and testify as to any matter whatever, even of his own volition, and, whether incriminatory or not, his testimony can not thereafter be brought up against him in any criminal proceedings. He can not be confronted with his own testimony or his own previous statement under oath even on cross-examination. The statute has become a shield to the criminal and an obstruction to justice."

15. In 1938 Congress made minor amendments to the statutes in question without recognizing their inconsistency with the Counselman case. 52 Stat. 943. See S. Rep.No.2108, 75th Cong., 3d Sess.

16. United States v. Monia, 1943, 317 U.S. 424, 63 S.Ct. 409, 87 L.Ed. 376, is, of course, inapplicable. That decision relates to the necessity of making a claim of immunity under the particular statute there involved. The opinion specifically states that the constitutional privilege,

734  70 SUPREME COURT REPORTER

original purpose, and its present status are all relevant considerations in its interpretation. Despite the fact that the literal language would encompass testimony elicited by the House Committee in its questioning of respondent relative to the production of the records of the association, the Court will not reach that result if it is contrary to the congressional intent and leads to absurd conclusions. United States v. Kirby, 1869, 7 Wall. 482, 486, 19 L.Ed. 278; Glickstein v. United States, 1911, 222 U.S. 139, 32 S.Ct. 71, 56 L.Ed. 128. And we are clearly of the opinion that the congressional purpose would be frustrated if the words, "in any criminal proceeding," were read to include a prosecution for wilful default under R.S. § 102.

[21] That purpose was "more effectually to enforce the Attendance of Witnesses * * * and to compel them to discover Testimony." [17] It had been the experience of Congress prior to 1857 that witnesses could not be compelled to disclose desired information, in part because of insufficient penalties for nondisclosure, and in part because of the constitutional privilege against self-incrimination. In an attempt to surmount the latter obstacle, Congress enacted what became R.S. § 859. By granting an immunity, it was the congressional intent to compel testimony which had hitherto been unavailable.

It is now contended that the protection of the statute, which was extended to witnesses in an effort to *obtain* testimony, protects equally the person who wilfully *withholds* testimony and is prosecuted for his wilful default. This contention completely ignores the purpose of the immunity. In the first place, it imputes to Congress the contradictory and irrational purpose of granting an immunity from prosecution for contempt in order to obtain evidence of that contempt. And in the second place, it assumes that Congress had some purpose to compel testimony of the kind here involved—statements of refusal by the witness to answer questions or produce documents—in return for which it was willing to grant an immunity. Such an assumption cannot be made. These statements have always been available to the Houses of Congress in contempt proceedings. They are uniformly printed in the reports of committees recommending contempt action [18] and are relied upon by the Houses when deliberating in contempt cases.[19] In short, the purpose of the statute contradicts its application to testimony of this kind.

---

as distinguished from the statutory immunity under consideration in that case, must be claimed. Id., 317 U.S. at page 427, 63 S.Ct. at page 410.

17. See 11 Stat. 155.

18. See, e. g., S.Rep.No.254, 73d Cong., 2d Sess., the Report of a Special Committee on Investigation of Air Mail and Ocean Mail Contracts, setting out in great detail the testimony of William P. MacCracken, Jr., et al., "in order that the Senate may determine whether or not any action shall be taken by the Senate with a view to proceeding against the said William P. MacCracken, Jr. * * * in the nature of a proceeding for contempt or otherwise. * * *" See Jurney v. MacCracken, 1935, 294 U.S. 125, 55 S.Ct. 375, 79 L.Ed. 802.

19. The incident giving rise to enactment of the statute illustrates the point. A correspondent of the New York Times, having made charges of corruption on the part of members of the House of Representatives in connection with pending legislation, was called before a select committee of the House and asked to name the Representatives involved. He declined to do so for the reason that the information had been given to him in confidence. The committee's questions and the witness' answers are set out at length in the Congressional Globe, 34th Cong., 3d Sess., pp. 403–404, as a part of the committee's report and resulted in his being called to the bar of the House "to answer as for a contempt of the authority of this House," and in his subsequent commitment. These proceedings were carried on in conjunction with consideration of the statute in the House. The contention now made would impute to Congress an intent to deprive the courts of the very information upon which the House had acted in the case giving rise to the statute.

UNITED STATES v. BRYAN 735
Cite as 70 S.Ct. 724

[22] Furthermore, to hold such testimony inadmissible in a prosecution for wilful default is to conclude that Congress,

340

for no discernible reason, made proof of contempt vastly more difficult before the courts than in its own chambers, since, as we have indicated, the Houses of Congress themselves are accustomed to rely upon such testimony. There is not a hint of any such purpose in the legislative history of the statute or the decisions construing it. On the contrary, this Court has often noted that prosecution under R.S. § 102 was intended "merely to supplement the power of contempt by providing for additional punishment." Jurney v. MacCracken, supra, 294 U.S. at page 151, 55 S.Ct. at page 379.

[23-25] The debates attending enactment of the statutes here in question and the decisions of this and other federal courts construing substantially identical statutes make plain the fact that Congress intended the immunity therein provided to apply only to *past* criminal acts concerning which the witness should be called to testify.[20]

341

The offense of contempt of Congress, with which we are presently concerned, on the other hand, matures only when the witness is called to appear before the committee to answer questions or produce documents and wilfully fails to do so. Until that moment he has committed no crime. There is, in our jurisprudence, no doctrine of "anticipatory contempt." While the witness' testimony may show that he has elected to perjure himself or commit contempt, he does not thereby admit his guilt of some past crime about which he has been summoned for questioning but commits the criminal act then and there.

In Glickstein v. United States, supra, this Court considered the problem thereby presented. It was there held that perjury committed in the course of testimony given pursuant to statute falls outside the purview of § 7(9) of the Bankruptcy Act, 11 U.S.C. § 25(10), 11 U.S.C.A. § 25(10), which, like R.S. § 859, provides that no testimony given by the witness (at a creditors' meeting) shall be used against him in any criminal proceedings. In the Court's view, such an immunity "relates to the past, and does not endow the person who testifies with a license to commit perjury." Id., 222 U.S. at page 142, 32 S.Ct. at page 73, 56 L.Ed. 128. The distinction is fully spelled out in a Circuit Court of Appeals opinion, Edelstein v. United States, 8 Cir., 1906, 149 F. 636, 9 L.R.A.,N.S., 236, which was cited with approval in the Glickstein case:

"To hold that the statute protects a bankrupt from the use of his evidence in a prosecution for perjury while actually testifying would defeat the obvious purposes of the act. It would, in effect, say to the bankrupt: You may forego the exercise of your constitutional privilege, and consent to testify concerning the conduct of your business, and in that way promote the efficient

---

20. Representative Orr: "The bill provides that no persons called before that committee to testify before them shall be subjected to criminal prosecution for any offense *they may have committed*, and for which their testimony would furnish the basis of an indictment." Cong. Globe, 34th Cong., 3d Sess. 406. Representative Washburn: "The second section of the bill declares that no person summoned as a witness shall be excused from answering a question for the reason that his answer would criminate himself; and provides that he shall be exempt from punishment for any offense *which he may testify that he has committed*, and that on trial for such offense in any court in the country such evidence shall not be used against him." Id. at 428. Senator Seward: "The second section of the bill provides that such person shall have the benefit of being exempt from prosecution *as to the matter concerning which he is called to testify*." Id. at 444. (Emphasis supplied throughout.) It may be pointed out that since the statute, as originally enacted, had the effect of granting total immunity from prosecution for any fact or act touching which the witness testified, adoption of respondent's contention would mean that Congress originally intended to immunize the witness who states before the committee that he will not answer questions or produce papers from any prosecution for his default.

administration of your estate and benefit your creditors, and by so doing secure

**342**

the immunity provided for; but if you give false testimony, calculated to embarrass the administration of your estate and to defeat the just rights of your creditors, and thereby commit a crime specially denounced against you, you shall enjoy the same immunity therefor. Moreover, it would, in effect, secure to the bankrupt the immunity in question for violating his part of the compact, namely, to testify—that is, to testify truthfully—by virtue of which he secured a right to the immunity. We are not willing to impute to Congress any such contradictory and absurd purpose. The words 'any criminal proceeding' cannot sensibly or reasonably be construed so literally and generally as to include the criminal proceeding provided by law for false swearing in giving his testimony. They obviously have reference to such criminal proceedings as arise out of past transactions, about which the bankrupt is called to testify." 149 F. at pages 643–644.

That statement is at least equally applicable to statements made by the witness in refusing to answer questions or produce papers. Such, in fact, was the rationale and decision of the Third Circuit Court of Appeals in just such a case. See In re Kaplan Bros., 1914, 213 F. 753. And see Cameron v. United States, supra, 231 U.S. at page 719, 34 S.Ct. at page 247, 58 L.Ed. 448; McCarthy v. Arndstein, 1924, 266 U.S. 34, 42, 45 S.Ct. 16, 17, 69 L.Ed. 158.

[26] The same reasons that led this Court to conclude that the clause excepting a prosecution for perjury from the reach of another immunity statute "was added only from superfluous caution and throws no light on the construction", Heike v. United States, 1913, 227 U.S. 131, 141, 33 S.Ct. 226, 227, 57 L.Ed. 450, Ann.Cas.1914C, 128, lead us to hold that Congress did not intend the term, "any criminal proceeding," to encompass a prosecution of the witness for wilful default under R.S. § 102. A contrary view would simply encourage the refusal of

**343**

witnesses to answer questions or produce papers, quite contrary to the purpose of the statute.

Respondent advances several contentions which were not passed upon by the Court of Appeals. We do not decide them at this time. The judgment of the Court of Appeals is reversed.

Reversed.

Mr. Justice FRANKFURTER agrees with this opinion except as to the portion marked *Third*, involving the applicability of § 3486 of Title 18 U.S.C., 18 U.S.C.A. § 3486, to the facts of this case, which requires him to dissent from the judgment of reversal.

Mr. Justice DOUGLAS and Mr. Justice CLARK took no part in the consideration or decision of this case.

Mr. Justice JACKSON, concurring.

With the result I am in agreement, but I do not see how this decision and that in the Christoffel case, 338 U.S. 84, 69 S.Ct. 1447, can coexist.

The Court is agreed that this defendant could rightly demand attendance of a quorum of the Committee and decline to testify or to produce documents so long as a quorum was not present. Therefore the real question here is whether, without making any demand, the issue may be raised for the first time long afterwards in a trial for contempt.

This case is the duplicate of Christoffel in this respect: in both cases defendants have sought to raise the question of no quorum for the first time in court, when they are on trial for an offense, without having raised it in any manner before the Committee while there was time to remedy it. The Court is now saying, quite properly I think, that this question must be raised at

**344**

the time when it can be corrected, and proper records made, and cannot be kept

UNITED STATES v. BRYAN 737
Cite as 70 S.Ct. 724

as an ace up the sleeve to be produced years later at a trial. But in Christoffel, the majority took the opposite view and said, "In a criminal case affecting the rights of one not a member, the occasion of trial is an appropriate one for petitioner to raise the question." Supra, 338 U.S. at page 88, 69 S.Ct. at page 1450. If this statement of the law is to be left standing, I do not see how we can say that what was timely for Christoffel is too late for Bryan. It is plain we are not following the Christoffel decision and so I think we should candidly overrule it.

The practice of withholding all objection until time of trial is not helpful in protecting a witness' right to a valid Committee. It prevents correction of any error in that respect and profits only the witness who seeks a concealed defect to exploit. Congressional custom, whether written or not, has established that Committeee Members may indulge in temporary absences, unless there is objection, without disabling those remaining from continuing work as a Committee. Members may step out to interview constituents, consult members of their staffs, confer with each other, dictate a letter, or visit a washroom, without putting an end to the Committee—but always subject to call whenever the point of no quorum is raised; that is notice that someone deems their personal presence important. This is the custom Christoffel, in effect, denied to members of Congress. A Member now steps out of a committee room at risk of nullifying the whole proceeding.

It is ironic that this interference with legislative procedures was promulgated by exercise within the Court of the very right of absentee participation denied to Congressmen. Examination of our journal on the day Christoffel was handed down shows only eight Justices present and that four Justices dissented in that

345

case. The prevailing opinion does not expressly indicate the Justices who joined in it, but only four nondissenting Justices were present to do so. On the record this would show only an equally divided Court, which would affirm the judgment below. The only way the four who were present and for a reversal could have prevailed was by counting for it one shown by the record to be absent. There is not even any public record to show that *in absentia* he joined the decision, or approved the final opinion, or considered the matter after the dissent was circulated; nor is there any written rule or law which permitted him to do so.

I want to make it clear that I am not criticizing any Justice or suggsting the slightest irregularity in what was done. I have no doubt that authorization to include the absent Justice was given; and I know that to vote and be counted *in absentia* has been sanctioned by practice and was without objection by anyone. It is the fact that it is strictly regular and customary, according to our unwritten practice, to count as present for purposes of Court action one physically absent that makes the denial of a comparable practice in Congress so anomalous. Of course, there is this difference: The absent Congressman was only necessary to a quorum; the absent Justice was necessary to a decision. No Committee action was dependent upon the Representatives presumed to be absent in the Christoffel case. All they could have done if present was to listen. In our own case, personal judgment and affirmative action of the absent member was necessary to make the Christoffel opinion a decision of the Court.

The ruling of the Court today seems irreconcilable with the Court's decision in that case. True, the ink on Christoffel is hardly dry. But the principle of *stare decisis*, which I think should be the normal principle of

346

judicial action, is not well served by failing to make explicit an overruling which is implicit in a later decision. Unless we really accede to its authority, it were far better to undo Christoffel before it becomes embedded in the law as a misleading influence with the profession. Of course, it is embarrassing to confess a blunder; it may prove more embarrassing

738    70 SUPREME COURT REPORTER

to adhere to it. In view of the holding today, I think that the decision in the Christoffel case should be forthrightly and artlessly overruled.

Mr. Justice BLACK, with whom Mr. Justice FRANKFURTER concurs, dissenting.

18 U.S.C. § 3486, 18 U.S.C.A. § 3486, provides that no testimony given by a witness before any committee of either house "shall be used as evidence in any criminal proceeding against him in any court, except in a prosecution for perjury committed in giving such testimony." The Court admits that use of such testimony in convicting Bryan for wilful failure to produce records violated the "literal language" of § 3486, but declines to give effect to that language. I dissent from the Court's refusal to abide by this congressional mandate.

The statutory exception of "prosecution for perjury" shows that the attention of Congress was focused on whether committee testimony should be admissible in any special type of criminal prosecution. Yet the Court now reads the statute as if Congress had forbidden the use of committee testimony "except in a prosecution for perjury *or for failure to produce records.*" Such extensive judicial law-making is particularly questionable when used to restrict safeguards accorded defendants in criminal cases. Moreover, this statute springs from Congress' recognition of the constitutional privilege against compulsory self-incrimination. The Court's narrowing of the statute marks a radical departure from the principle underlying previous interpretations of other immunity legislation.

347
Smith v. United States, 337 U.S. 137, 69 S.Ct. 1000; United States v. Monia, 317 U.S. 424, 63 S.Ct. 409, 87 L.Ed. 376.

The reasons given by the Court for its amendment of the statute have an anomalous basis: the Court feels compelled to alter the clear language of § 3486 in order not to "subvert the congressional purpose" which it admits has already been irrevocably frustrated by the decision in Counselman v. Hitchcock, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110.

Moreover, the statutory language is so clear and precise that dubious legislative history cannot contradict it. And no part of that history even tends to show that Congress meant to permit use of a witness' testimony to convict him of any crime other than perjury. There is a justifiable reason for the perjury exception. The crime consists of the testimony itself, without which no prosecution would be possible. Not so with default in producing papers. That crime is based not on a witness' testimony but rather on his failure to produce—conduct which can be proved by members of a committee, clerks, or spectators. There is therefore no basis for saying that application of the statute as Congress wrote it would lead to "absurd conclusions" by encouraging the "refusal of witnesses to answer questions or produce papers."

As for other essential elements of the crime, such as power to produce, they cannot be proved by evidence extracted from a defendant under compulsion. A witness summoned to testify and produce papers is no less entitled to invoke the protection of this statute and of the Fifth Amendment's privilege against self-incrimination than is any other defendant. One who has failed to produce certainly could not be compelled to answer questions concerning his power to produce, thereby making him a "witness against himself." If application of the statute as Congress wrote it would lead to "absurd conclusions," so would the Fifth Amendment.

348
The Court finds comfort in the statement that the Committee testimony of witnesses is "uniformly printed in the reports of committees recommending contempt action" to the houses of Congress. However extensive this practice may be, it would not justify the use of such evidence in a criminal trial. By its own terms 18 U.S.C. § 3486, 18 U.S.C.A. § 3486, is expressly

UNITED STATES v. FLEISCHMAN 739
Cite as 70 S.Ct. 739

limited to "criminal proceedings in any court."[1]

For these reasons the judgment should be reversed and the cause remanded for a new trial.



339 U.S. 349
**UNITED STATES v. FLEISCHMAN.**
No. 98.

Argued Dec. 15, 1949.

Decided May 8, 1950.

Rehearing Denied June 5, 1950.

See 339 U.S. 991, 70 S.Ct. 1017.

Ernestina G. Fleischman, a member of the executive board of the Joint Anti-Fascist Refugee Committee, was convicted for willful failure to produce papers sought by subpoena issued by a congressional investigating committee. From a judgment of the Court of Appeals for the District of Columbia Circuit, Henry White Edgerton, Circuit Judge, 174 F.2d 519, 84 U.S.App.D.C. 388, reversing a judgment of the District Court, the United States brings certiorari. The Supreme Court, Mr. Chief Justice Vinson, held that the evidence was sufficient to sustain the conviction of the defendant even though the defendant did not have the papers involved in her possession, in absence of proof that she endeavored in good faith to bring about compliance with the subpœna.

Judgment reversed.

Mr. Justice Black and Mr. Justice Frankfurter dissented.

**1. United States ⟺23**
Witness testifying before congressional committee without suggesting absence of a quorum could not raise issue of lack of quorum as defense to subsequent prosecution for willful failure to produce papers sought by subpoena issued by committee. 2 U.S.C.A. § 192.

**2. Criminal law ⟺393(1)**
In prosecution for willful failure to produce papers sought by subpoena issued by congressional committee, statute prohibiting use in evidence in criminal proceeding of testimony given by witness before a congressional committee did not preclude introduction of testimony given by defendant on her appearance before committee in response to subpoena. 18 U.S.C.A. § 3486.

**3. United States ⟺23**
Subpoena directing member of executive board of an association to produce before congressional committee records of the association was not defective because addressed to individual member of the board instead of to the association. 2 U.S.C.A. § 192.

**4. Corporations ⟺310(1)**
**Municipal corporations ⟺170**
**Officers ⟺108**
A person accepting office of joint responsibility, whether as director of corporation, member of governing board of municipality or any other position in which compliance with lawful orders requires joint action by a responsible body of which he is a member, assumes an individual responsibility to act within limits of his power to bring about compliance with the order.

**5. United States ⟺23**
The directing officers of an unincorporated association have same responsibility to comply with subpoena issued by a congressional committee as if they were corporate officers. 2 U.S.C.A. § 192.

**6. Criminal law ⟺551**
The prosecution need not adduce positive evidence to support a negative averment the truth of which is fairly indicated by established circumstances and which, if untrue, could be readily disproved by production of documents or other evidence probably within the defendant's control.

---

1. This distinction between criminal trials and contempt proceedings at the bar of Congress is eminently reasonable in view of the practical differences between the two. See dissenting opinion in United States v. Fleischman, 339 U.S. 349, 70 S.Ct. 739. For a discussion of congressional contempt procedures, see Eberling, Congressional Investigations 179 and passim (Columbia University Press, 1928).